UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIMOTHY TAYLOR, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-09-481 |
| | § | |
| BAR MT LLC; dba SHOT BAR, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

### I. Introduction

Pending before the Court is the defendant's, Bar MT LLC doing business as Shot Bar, ("Shot Bar"), motion for summary judgment (Docket Entry No. 27). The plaintiffs, Timothy Taylor, Milan Stephen Alexander and Robert Collier (collectively the "plaintiffs"), submitted a response in opposition to this motion (Docket Entry No. 42) and an appendix thereto (Docket Entry No. 43). Further pending before the Court is Shot Bar's motion to dismiss all claims with prejudice (Docket Entry No. 26). The plaintiffs submitted a response to this motion (Docket No. 28). Having carefully reviewed the parties' submissions, the record and the applicable law, the Court hereby denies these motions.

### II. Factual Background

Shot Bar[1] is a bar in Houston, Texas. In August of 2008, the plaintiffs—three African American men—were denied entrance to Shot Bar because they were in violation of the establishment's dress code. The plaintiffs assert that the dress code is a pretext to discriminate against African American patrons. A lawsuit arising from this incident was filed against Shot Bar in February of 2009. The facts leading to this suit are further detailed below.

---

[1] The phrase "Shot Bar" will be used throughout this opinion to refer to both the corporate entity (Bar MT LLC's doing business as Shot Bar) and the physical nightclub/bar known as the "Shot Bar."

Shot Bar is decorated to resemble a bar on Sixth Street in Austin, Texas. The bar serves various alcoholic beverages. There are televisions inside the bar. The televisions are used for either closed circuit television (displaying the bar's drink menu and a summary of the songs being played by the disc jockey) or to show television programs including sporting events and the news. On some evenings, a disc jockey plays recorded music on a stereo system.

With regard to the evening of the alleged discrimination, the plaintiffs assert that their denial of entry to Shot Bar was pretextual. They state that they were (appropriately) dressed in jeans and button-down dress shirts, while Caucasian patrons had been admitted (inappropriately) wearing shorts, flip flops, football jersey and tennis shoes. The plaintiffs assert that these actions caused them significant and irreparable harm, embarrassment and humiliation along with mental anguish, pain and suffering. As such, they brought suit against Shot Bar under 42 U.S.C. § 1981 and 42 U.S.C. § 2000a ("Title II").

After the filing of this lawsuit, Shot Bar submitted interrogatories to the Plaintiffs on April 9, 2009. Shot Bar asserts that the plaintiffs failed to serve their answers separately or under oath, served these responses two days late and provided incomplete and evasive answers to these interrogatories. On July 6, 2009, the Court issued an order granting Shot Bar's amended motion to compel complete answers to its interrogatories ("the order"). On July 14, 2009, Shot Bar filed its motion to dismiss all claims with prejudice for failure to comply with the order. The plaintiffs assert that on July 16, 2009, they complied with the order.

### III. Contentions

#### A. The Defendant's Contentions

Shot Bar argues that summary judgment is appropriate on the plaintiffs' Title II claims. To this end, it asserts that its establishment is not a place of public accommodation under 42

U.S.C. § 2000a(b). Further, Shot Bar maintains that its operations do not affect commerce, as defined in 42 U.S.C. § 2000a(c). Lastly, the plaintiffs' case should be dismissed as a sanction for discovery delays, argues Shot Bar.

### B. The Plaintiffs' Contentions

The plaintiffs assert that summary judgment is inappropriate on their Title II claims. They argue that Shot Bar satisfies both the "public accommodation" and the "affect commerce" requirements for a Title II cause of action. Lastly, the plaintiffs state that, due to the limited scope of their discovery delays, dismissal of their claims as a sanction is improper.

## IV. Standard of Review

### A. Rule 56(c) - Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The [movant] bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once the movant carries this initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). The nonmovant must go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmovant may not rest on conclusory allegations or denials in its pleadings that are

unsupported by specific facts. Fed. R. Civ. P. 56(e). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).

In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch*, 140 F.3d at 625. "A dispute regarding a material fact is 'genuine' if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party." *Roberson v. Alltel Info. Servs*., 373 F.3d 647, 651 (5th Cir. 2004). Thus, "[t]he appropriate inquiry is 'whether the evidence represents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson*, 477 U.S. at 251–52).

### B. Rule 37 – Discovery Sanctions

Federal Rule of Civil Procedure 37 ("Rule 37") "establish[es] a flexible means by which a court may enforce compliance with the Federal discovery procedures through a broad choice of remedies and penalties." *Bon Air Hotel, Inc. v. Time, Inc.*, 376 F.2d 118, 121 (5th Cir. 1967). "[Rule] 37(b)(2)(C) authorizes a court to dismiss a complaint and render a default judgment as sanctions for failure to comply with discovery orders." *Logic Leasing & Fin. Co. v. Admin. Information Mgmt. Group, Inc.*, No. 92-2075, 1992 WL 352773, at *3 (5th Cir. Nov. 27, 1992) (unreported opinion). "Although a trial judge's latitude in framing orders and in penalizing failures to comply [with discovery orders] is broad, his discretion is not limitless." *Bon Air Hotel*, 376 F.2d at 121–22 (citing *Mitchell v. Johnson*, 274 F.2d 394 (5th Cir. 1960); *O'Toole v. William J. Meyer Co.*, 243 F.2d 765 (5th Cir. 1957); *Indep. Prods. Corp. v. Loew's, Inc.*, 283 F.2d 730 (2nd Cir. 1960)). As such, a sanction of dismissal for failure to comply with a

discovery order usually "require[s] a finding of [willfulness] or bad faith failure to comply with a court's discovery order." *Truck Treads, Inc. v. Armstrong Rubber Co.*, 818 F.2d 427, 429 (5th Cir. 1987) (citing *Batson v. Neal Spelce Assocs.*, 765 F.2d 511, 514 (5th Cir. 1985)).

### V. Analysis & Discussion

#### A. Title II – Alleged Discrimination

"Title II of the Civil Rights Act of 1964 prohibits discrimination or segregation on the basis of race, color, religion, or national origin in places of public accommodations whose operations affect commerce." *Rousseve v. Shape Spa for Health & Beauty, Inc.*, 516 F.2d 64, 66 (5th Cir. 1975). "One of the purposes of the public accommodations provisions of the Civil Rights Act of 1964 was to eliminate the unfairness, humiliation, and insult of racial discrimination in facilities which purport to serve the general public." *Id*. at 67. In pertinent part, Title II provides:

> (a) **Equal access** [-] All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.
>
> (b) **Establishments affecting interstate commerce** [-] Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:
> \* \* \*
> (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and
> \* \* \*
> (c) **Operations affecting commerce; criteria; "commerce" defined** [-] The operations of an establishment affect commerce within the meaning of this subchapter if . . . (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce . . . .   For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country

> or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

42 U.S.C.A. § 2000a.  The Fifth Circuit has further provided that:

> Although recognizing that the Act was not designed to cover all establishments, this Court en banc concluded that Sections 2000a(b)(3) and (c)(3) must be read "with open minds attuned to the clear and strong purpose of the Act, namely, to secure for all citizens the full enjoyment of facilities described in the Act which are open to the general public. That Title II of the Civil Rights Act is to be liberally construed and broadly read we find to be well established." *Miller v. Amusement Enterprises, Inc.*, 5 Cir. 1968, 394 F.2d 342, 349. Thus we read the statute, particularly the term "place of entertainment", as did the Supreme Court in *Daniel v. Paul*, 1969, 395 U.S. 298, 307–308, 89 S.Ct. 1697, 1702, 23 L.Ed.2d 318, 326, according to its generally accepted meaning so as to give full effect to Congress' overriding purpose of eliminating the affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public.

*U.S. v. DeRosier*, 473 F.2d 749, 751 (5th Cir. 1973).

Premised on the above, Shot Bar properly asserts that Title II "contains a two-part analysis which is used to determine whether Shot Bar is a covered establishment."  Initially, the plaintiffs must establish that the Shot Bar is a place of public accommodation (for the purposes of Title II).  Second, plaintiffs must establish that Shot Bar's "operations affect commerce," as defined in Title II.

### 1. Covered Establishment

The first element of plaintiff's claim is to show that Shot Bar is an establishment covered under subsection (b) of Title II.   Specifically, the outcome determinative question is whether Shot Bar is a "place of entertainment" under Title II.  While the case law is scant on this issue, the Court recognizes two pertinent cases from the Fifth Circuit.

In *U.S. v. DeRosier*, the Fifth Circuit addressed the question of "whether an establishment, characterized as a 'neighborhood bar', which derives a small portion of its total

business from mechanical amusement devices which have moved in interstate commerce is a 'place of entertainment' within the meaning of Title II . . . and therefore [is] subject to its provisions." 473 F.2d 749, 750. The court found that it was. However, this finding is not necessarily outcome determinative in the case at bar.

As recognized by the plaintiffs, "[t]he Court [in *DeRosier*] based its holding on the fact that [the bar] had a juke box, shuffle board and pool table, all manufactured outside the State located within the bar and that constituted 3% of appellee's business, dollarwise." Accordingly, the pertinent issue arising from *DeRosier* is whether the present case can be distinguished because Shot Bar lacks "a juke box, shuffle board and pool table" (or the equivalents thereof), which constitutes a percentage of Shot Bar's business. The Court finds that it cannot be distinguished.[2]

In finding the present case not distinguishable from *DeRosier*, the Court looks to the logic set forth therein:

> [A]t least facially, the presence of the out-of-state manufactured juke box, shuffle board and pool table for the use and enjoyment of the bar's patrons would quite comfortably comport with a literal, but liberal, interpretation of the Act's language. Certainly an establishment which provides mechanical devices for the use and enjoyment of its patrons or customers is a "place of entertainment". Just as logically, these devices are, by use if not by definition, "sources of entertainment" which here were not only "customarily" presented, but permanently provided for the entertainment of the establishment's customers.

473 F.2d at 751–52. The above quotation clarifies that, in *DeRosier*, it was the presence of the "juke box, shuffle board and pool table" that brought the bar within the scope of a "place of entertainment." Specifically, *DeRosier* relied on the entertainment benefits of these devices—as opposed to the profits therefrom—to find the bar to be a place of entertainment. As such, the

---

[2] The Court notes that Shot Bar does not argue that the present case is distinguishable from *DeRosier*. Rather it vehemently asserts that "*DeRosier* is a tortured construction of [Title II,]" which, in essence, should be ignored. This Court is bound by Fifth Circuit precedent and accordingly, declines the invitation to ignore *DeRosier*.

Court finds that the presence of entertainment devices (as opposed to profits from entertainment devices) is indicative of a place of entertainment. This conclusion is consistent with subsequent Fifth Circuit case law.

In *Rousseve v. Shape Spa for Health & Beauty, Inc.*, the Fifth Circuit addressed "whether a women's health and exercise club or studio is [a place of entertainment] within the coverage of the public accommodations provisions of [Title II]." 516 F.2d 64, 65 (5th Cir. 1975). While the subject matter of *Rouseeve* is not the same as the present case, the logic applied to find the health club within the scope of Title II is instructive. Initially, the court noted that Title II "must be read 'with open minds attuned to the clear and strong purpose of the Act, namely, to secure for all citizens the full enjoyment of facilities described in the Act which are open to the general public.'" *Id.* at 67 (quoting *Miller v. Amusement Enters., Inc.*, 394 F.2d 342, 349 (5th Cir. 1968)). Further, it was recognized that "[i]n *Daniel v. Paul*, the Supreme Court noted that 'entertainment' is defined as 'the act of diverting, amusing, or causing someone's time to pass agreeably: (synonymous with) amusement.'" *Id.* (quoting 395 U.S. 298, 306 n.7) (1969)). Lastly, *Rousseve* addressed *DeRosier*, stating that the Fifth Circuit had concluded in that case that Title II "does not require that the 'entertainment be of a certain variety or that a certain quantum of the establishment's business be derived from the entertainment of its customers.'" *Id.* at 68 (quoting *DeRosier*, 473 F.2d at 752). Thus, from *Rousseve*, it can be derived that a place of entertainment includes locations where people divert or amuse themselves or pleasurably pass their time, regardless of the level of business derived from such amusements.

Premised upon *DeRosier* and *Rousseve*, the Court recognizes the outcome determinative question (on this issue) to be whether the stereo system and the televisions located in Shot Bar (the "present devices") can be distinguished from the juke box, shuffle board and pool table

found in *DeRosier*. This issue can be further broken down into two queries: (1) are the present devices used for entertainment purposes, similar to the is the juke box, shuffle board and pool table in *DeRosier*; and (2) should the present devices be distinguished from *DeRosier* because customers do not specifically pay for their use? If the present devices cannot be distinguished on either of these issues, then the present suit cannot be distinguished from *DeRosier* with regard to whether Shot Bar is a place of entertainment.

First, as noted in *Rousseve*, the Supreme Court has broadly defined entertainment for the purposes of identifying places of entertainment. Specifically, "'entertainment' is defined as 'the act of diverting, amusing, or causing someone's time to pass agreeably: (synonymous with) amusement.'" The juke box, shuffle board and pool table in *DeRosier* were (presumably) used to divert, amuse, or cause patrons' time to pass agreeably. The present devices are of a sort that would enjoy similar use by bar patrons. Accordingly, the nature of the present devices (as instruments of entertainment) cannot be differentiated from the juke box, shuffle board and pool table in *DeRosier*; each of these devices is used for entertainment.

Second, the fact that customers of Shot Bar do not specifically pay for the use of the present devices does not distinguish *DeRosier*. By its express terms, *DeRosier* dealt with the limited subject of whether a bar that "derives a small portion of its total business from mechanical amusement devices . . . is a 'place of entertainment.'" 473 F.2d 749, 750. However, as recognized in both *DeRosier* and *Rousseve*, the quantum of financial benefit from specific devices is not outcome determinative. Shot Bar derives some financial benefit from the present devices. The presence of these devices encourages patrons to spend time at the bar, which in turn elevates the sales of alcoholic beverages. Accordingly, Shot Bar enjoys a financial benefit from the present devices, and *DeRosier* is indistinguishable on this point.

Based upon the above discussion, *DeRosier* cannot be distinguished from the case at bar. Accordingly, similar to the tavern in *DeRosier*, Shot Bar constitutes a place of entertainment for the purposes of Title II.

### 2. Interstate Commerce

The second element of establishing that Shot Bar falls under Title II is to show that the bar's "operations affect commerce." To satisfy this burden, the plaintiffs must show that Shot Bar "customarily presents . . . sources of entertainment which move in commerce . . . ." 42 U.S.C. § 2000a(c). For this issue, commerce should be construed to mean "travel, trade, traffic, commerce, transportation, or communication among the several States [and/or a foreign country.]" *Id.* Accordingly, the second question under Title II pertains to whether a source of entertainment has been moved in interstate commerce. *See U.S. v. DeRosier*, 473 F.2d 749, 752 (5th Cir. 1973) ("[D]evices have moved in 'commerce' when they were manufactured in one state and used for their intended purpose in another.").

On this issue, Shot Bar argues that "[t]he televisions and stereo system located [therein] do not constitute operations that affect commerce as no money is collected from customers as a fee for watching or listening." This argument is not germane to this issue. The outcome determinative issue at bar is whether the sources of entertainment (here, the televisions and/or stereo system) have been moved in interstate commerce. Whether the customer pays for the use of the source of entertainment is of no consequence with regard to this prong of the Title II analysis.[3]

Under these circumstances, Shot Bar cannot show that the sources of entertainment in its establishment do not satisfy the interstate commerce prong of this cause of action. As such,

---

[3] To the extent that payment by a customer for the use of an entertainment device might be pertinent to the Title II question in any manner, this issue was addressed earlier in this opinion.

having considered Shot Bar's arguments, summary judgment is not appropriate on the plaintiffs' Title II claim.

### B. Rule 37 – Discovery Sanctions

Shot Bar has requested dismissal of the "[p]laintiffs' claims and causes of action pursuant to Rule 37(b)(2)(A)(v) of the Federal Rules of Civil Procedure." It premises this request on the plaintiffs' failure to comply with this Court's order to fully, adequately, separately and under oath respond to Shot Bar's First Set of Interrogatories ("the order"). (*See* Docket Entry No. 25). At the time of Shot Bar's request, eight days had passed since the Court issued the order. The plaintiffs responded to Shot Bar's first set of interrogatories ten days after the Court issued the order.

In disagreeing with Shot Bar, the plaintiffs assert that they "were required to serve the responses within a reasonable amount of time since the Order did not expressly state a deadline[, and they further] argue that serving the responses within ten days [wa]s reasonable." The Court agrees with the plaintiffs.

Rule 37(b)(2)(A) provides that "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders. They may include . . . dismissing the action or proceeding in whole or in part . . . ." On this rule, U.S. District Judge Micaela Alvarez (S.D. Tex.) has recently stated:

> Federal Rule of Civil Procedure 37(b)(2)(A)(v) authorizes dismissal with prejudice when a party refuses to obey a discovery order. Because of the severity of this sanction, dismissal with prejudice is typically appropriate when there is a clear record of delay or contumacious conduct and the party's refusal to obey a discovery order is done willfully and in bad faith. *Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030, 1032 (5th Cir. 1990); *see also National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (holding that the trial court did not abuse its discretion in dismissing action when plaintiffs failed to answer interrogatories on time, and failure to supplement inadequate original answers was deemed to be in bad faith).

> Additionally, the conduct must substantially prejudice the opposing party and a lesser sanction must be an inefficacious deterrent. *Coane*, 898 F.2d at 1032 (citing *Brinkmann v. Dallas County Deputy Sheriff Abner*, 813 F.2d 744 (5th Cir. 1987)).

*Arredondo v. Flores*, No. L-05-191, 2008 WL 4414308 (S.D. Tex. Aug. 22, 2008) (unreported opinion); *see also Truck Treads, Inc. v. Armstrong Rubber Co.*, 818 F.2d 427, 429 (5th Cir. 1987). As discussed below, the requisite willful or bad faith refusal to obey a discovery order is not present in this case.

In its argument, Shot Bar cites to *National Hockey League v. Metropolitan Hockey Club, Inc.*, for the proposition that "a court may impose discovery sanctions in an effort to secure compliance with the discovery rules, deter other parties from violating such rules, and to punish those parties who do violate them." 427 U.S. 639 (1976). The cited case does stand for this proposition. However, the case at bar is distinguishable from *Metropolitan Hockey Club*. In that case, the trial court made the following findings:

> After seventeen months where crucial interrogatories remained substantially unanswered despite numerous extensions granted at the eleventh hour and, in many instances, beyond the eleventh hour, and notwithstanding several admonitions by the Court and promises and commitments by the plaintiffs, the Court must and does conclude that the conduct of the plaintiffs demonstrates the callous disregard of responsibilities counsel owe to the Court and to their opponents. The practices of the plaintiffs exemplify flagrant bad faith when after being expressly directed to perform an act by a date certain, . . . June 14, 1974, they failed to perform and compounded that noncompliance by waiting until five days afterwards before they filed any motions. Moreover, this action was taken in the face of warnings that their failure to provide certain information could result in the imposition of [sanctions] under Fed. R. Civ. P. 37.

*Id.* at 640–41 (quoting *In re Prof'l Hockey Antitrust Litig.*, 63 F.R.D. 641, 656 (E.D. Pa. 1974)). To the extent that the plaintiffs *might* have engaged in bad faith or willful misconduct, their delay of ten days in complying with the order is nowhere near the level of malfeasance found in *Metropolitan Hockey Club*. Shot Bar's assertions of delays prior to issuance of the order do nothing to change this finding. Absent the necessary finding of bad faith or willful misconduct,

dismissal is improper. As such, Shot Bar's request that the plaintiffs' causes of action be dismissed under Rule 37(b)(2)(A)(v) is denied.

## VI. Conclusion

Based on the foregoing, the Court hereby DENIES Shot Bar's motions.

It is so **ORDERED**.

SIGNED at Houston, Texas this 22nd  day of December, 2009.

_____

                Kenneth M. Hoyt
                United States District Judge